NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Original
No. LD-2017-0010

GALLANT'S CASE

Argued: December 6, 2017
Opinion Issued: December 29, 2017

Janet F. DeVito, general counsel (Brian R. Moushegian, deputy general counsel, on the brief and orally) for the attorney discipline office.

Preti Flaherty, PLLP, of Concord (William C. Saturley on the brief and orally), for the respondent.

LYNN, J. This case arises out of the interim suspension of the respondent, John F. Gallant, from the practice of law. A Judicial Referee (Duggan, J.) recommended that the suspension remain in effect. We agree with the referee's recommendation.

I

The respondent's interim suspension stems from his August 2017 indictment for felony witness tampering. See RSA 641:5 (2016). The indictment alleges that, in May 2017, the respondent, "believing that an

investigation was pending regarding an alleged violation of a restraining order by his client as well as a hearing on said restraining order, . . . purposely attempted to induce or otherwise cause E.F.," the former girlfriend of his client and former law partner, "to withhold testimony and/or information from the court by telling [her,] 'I spoke to the judge yesterday; he doesn't want to hear this[,]' and '[c]an't you just drop it' or words to that effect." (Bolding omitted.)

The relevant facts underlying the indictment, gleaned from the documents submitted to us, are as follows. See Lawrence v. Philip Morris USA, 164 N.H. 93, 96-97 (2012). In April 2017, E.F. applied for a domestic violence temporary order of protection against the respondent's client. On April 28, the Circuit Court (Moore, J.) issued a temporary protective order on an ex parte basis. Before the final hearing on E.F.'s petition took place, the respondent's client was arrested and charged with four counts of violating the protective order and three counts of theft by unauthorized taking. Originally, the client's bail was set at $25,000. On May 18, at a hearing on the criminal charges at which E.F. was represented by Attorney William Henry Barry, the client's bail was reduced to $2,000.

On May 23, the court held a bail review hearing at which the respondent, his client, and a police officer from the Nashua Police Department were present, and at which the following colloquy occurred:

> [THE RESPONDENT]: Thank you, Judge. I actually just got a quick question. I think we're back on tomorrow on the underlying restraining order, because it was an ex parte hearing. So, yeah, obviously there's nothing we can do without the other side, but --
>
> THE COURT: No, sir, I can't discuss that without the other side here; however, sit down with Attorney Barry.
>
> [THE RESPONDENT]: Yes.
>
> THE COURT: I am sure that the two of you can resolve this issue and I'll be happy to work with you. I'm here tomorrow, so you can do one of two things on the underlying restraining order. You can certainly sit down with Attorney Barry and see if you can't work it out. If for some reason you feel that there's an issue having me hear the case, just let me know and I'll find you a different judge.

The following day, E.F. appeared without counsel for the final hearing on the protective order. Also present were the respondent and his client. In a June 29, 2017 police interview, E.F. said that, before the hearing began, the respondent asked to speak with her. E.F. told the police that the respondent

2

asked, "[C]an't we come to an agreement out of court," to which she responded that she was uncomfortable doing so. E.F. told the police that the respondent then claimed that he had already spoken with Barry. E.F. called Barry, who confirmed that he had not spoken with the respondent.

E.F. told the police that, shortly thereafter, the respondent again asked to speak with her. E.F. said that the respondent referred to the bail review hearing held on the prior day and stated, "I spoke to the judge yesterday; he doesn't want to hear this." E.F. told the police that the respondent said that the domestic violence protective order "was going to look really bad on [his client's] record," to which E.F. responded that "chainsaws look really bad," referring to an April 27 incident described in her petition for a domestic violence protective order. E.F. said that the respondent then asked, "Can't you just drop it"? E.F. advised that the respondent "tried to convince her to agree to a restraining order of only thirty days." E.F. reported that she believed that the respondent "was trying to get her to miss her hearing by going to another room to speak with him," and that he "was trying to get her to leave so that the whole matter would be dropped."

In June 2017, the respondent appeared at court on his client's behalf for a pretrial conference in the criminal case. Donald C. Topham, police prosecutor for the Nashua Police Department, approached the respondent about the matter. Topham reported that he told the respondent that Topham would speak with the respondent after speaking with the department's victim/witness advocate. When he did so, the victim/witness advocate advised Topham that E.F. "was present and wished the charges . . . to go forward." According to Topham, the victim/witness advocate further advised that the victim "had previously come to Court to obtain a Permanent Restraining Order" against the respondent's client and that, before the start of the final hearing on that order, E.F. had been approached by the respondent. The victim/witness advocate reported that, according to E.F., the respondent had said, "I've spoken to the Judge and he wants this to go away." The victim/witness advocate also reported that, according to E.F., the respondent had stated "because of this[,] [E.F.] needed to sign an Agreement that[,] even though the Restraining Order that would be issued that day was valid for 1 year, there would be a Review Hearing in 3 months at which time the Order would be Dismissed."

Topham reported that, after speaking with the victim/witness advocate, he asked the respondent to speak with him:

> Once I closed the conference room door and sat down, [the respondent] looked at me and immediately stated "The Judge wants this to go away." I said "What?" [The respondent] then re-stated "The Judge wants this to go away."

3

> [The respondent] then added "The victim wants this to go away and won't show up."
>
> I then told [the respondent] that this was not going away and that the victim was present and wished the case to go forward.
>
> [The respondent] then stated "I've been sitting in the Courtroom and she's not here."
>
> I informed [the respondent] that the victim was in fact present and had been and was still in a different part of the Courthouse . . . .

Topham stated that he "was sufficiently concerned about the nature of [the respondent's] comments . . . that [he] immediately notified [his] chain of command" about them and about the possibility that the respondent had engaged in witness tampering.

The police investigated the respondent's statements. After taking E.F.'s statement, the police interviewed Barry, who confirmed that E.F. had telephoned him from the courthouse on May 24. According to Barry:

> [E.F.] advised that [the respondent] approached her and told her that he had spoken with Atty Barry and that Atty Barry had told [the respondent] that [E.F.] did not need to be present for the hearing on the temporary restraining order. [E.F.] further advised that [the respondent] told her he had talked with Judge Moore and Judge Moore said [E.F.] did not need to be at court.

Barry stated that he never spoke to the respondent about the criminal charges or the protective order. Barry advised that "he never received an email or call on his cellphone from [the respondent]," and that his office staff confirmed that the respondent "never called the office or left a message there."

The police also interviewed Judge Moore, who presided over both the domestic violence protective order and the criminal proceedings. Judge Moore advised that "he did not recall ever bringing [the respondent] into chambers and could not think of a reason why he would do so." Judge Moore stated that he "had no independent recollection of having any conversation with [the respondent] that was not on the court record," and "that even if [the respondent] had approached the bench to speak with [him] during a recorded court hearing, the audio record of that hearing would reflect any conversation." When the police advised Judge Moore of the respondent's alleged statements to E.F., Judge Moore asked, "Why would I say that?" Judge Moore further stated, "I can't ever imagine saying to anyone I want this to go away." Judge Moore advised "that he never had a private, off-the-record conversation with [the

respondent] and never said anything about wanting the case to go away or not wanting to hear the matter in court."

In August 2017, the respondent was indicted by a grand jury for felony witness tampering. See RSA 641:5. In September 2017, the attorney discipline office (ADO) filed a certified copy of the indictment with this court. On September 13, we ordered that, "considering the nature of the alleged felony, [the respondent's] immediate suspension from the practice of law is necessary to protect the public and to preserve the integrity of the legal profession." See Sup. Ct. R. 37(9)(i), 37(16)(d), (f); see also Reiner's Case, 152 N.H. 163, 168 (2005) (Reiner's Case I); Reiner's Case, 152 N.H. 594, 597 (2005) (Reiner's Case II).

On September 15, the respondent requested a hearing on the interim suspension. See Reiner's Case I, 152 N.H. at 167. Thereafter, we appointed the judicial referee to hold a hearing on whether the respondent's "interim suspension from the practice of law should be lifted," and to "make a recommendation to the court as to whether suspension is necessary for the protection of the public and the preservation of the integrity of the legal profession." See id. That hearing was held on September 26 upon offers of proof based upon an agreed-upon set of documents, including police reports, transcripts, and court documents.

Although the respondent stated in his hearing memorandum that the instant disciplinary matter "is the first accusation against him of this kind," at the hearing, his counsel agreed that the respondent had previously been disciplined for violating his ethical duty of candor to the tribunal. See N.H. R. Prof. Conduct 3.3. In its hearing memorandum, the ADO asserted that, in the prior disciplinary matter, the respondent had been found to have violated both his ethical duty of candor to the tribunal, see id., and his duty to be truthful in his statements to others, see N.H. R. Prof. Conduct 4.1. Both the ADO and the respondent's counsel agreed that, for those ethical violations, the respondent had been suspended from the practice of law for six months and that the suspension had been stayed for two years. The ADO stated that the suspension was never imposed because the respondent complied with the terms of the professional conduct committee's order.

On October 10, the referee filed his report and recommendation with the court. The referee found that the ADO had proved by a preponderance of the evidence that the respondent's interim suspension was necessary both to preserve the integrity of the legal profession and to protect the public. Therefore, the referee recommended that the court not lift its September 13 order directing the respondent's immediate suspension from the practice of law.

On October 27, the respondent filed a notice of challenge to the referee's report and recommendation. Subsequently, we ordered briefing and oral argument to address the issues the respondent listed in his notice of challenge.

II

A

Supreme Court Rule 37(9)(i) mandates that the court "take such actions as it deems necessary, including but not limited to the suspension of [an] attorney," whenever that attorney "is indicted or bound over for any felony." We may impose an interim suspension pending the resolution of such felony charges when doing so is deemed necessary for: (1) "the protection of the public"; and (2) "the preservation of the integrity of the legal profession." Sup. Ct. R. 37(16)(f); see Reiner's Case I, 152 N.H. at 168; Reiner's Case II, 152 N.H. at 597.

Ordinarily, we defer to the factual findings of a referee in a lawyer discipline case, reviewing only "whether a reasonable person could have reached the same decision as the referee." Reiner's Case II, 152 N.H. at 597. However, we are permitted to "give less than ordinary deference" to the factual findings of the referee in this case because he decided the case on offers of proof, based upon an agreed-upon set of documents, and because all of the documents upon which he based his decision "are available for our perusal." Lawrence, 164 N.H. at 96-97 (quotations omitted). We review the referee's legal rulings de novo and "retain the ultimate authority to determine whether suspension is necessary under Rule 37(16)(f)." Reiner's Case II, 152 N.H. at 597.

B

The respondent's first two arguments are premised upon his contention that Rule 37(9-A) governs this case. See Sup. Ct. R. 37(9-A). Specifically, the respondent argues that the referee erred by applying the preponderance of evidence standard instead of the clear and convincing evidence standard set forth in Rule 37(9-A)(d). Similarly, he asserts that the referee erred by neglecting to "consider whether measures short of continuing the interim suspension would adequately safeguard the public against the threat of substantial harm," as set forth in Rule 37(9-A)(d).

We decline to address the merits of those arguments because the respondent raised them for the first time in his challenge to the referee's report and recommendation. In his hearing memorandum, the respondent conceded that this case is governed by Rule 37(9) and the procedure we set forth in Reiner's Case I. Rule 37(9)(a) allows the court to suspend an attorney upon the

6

attorney's <u>conviction</u> for a felony or certain enumerated lesser crimes.  <u>Sup. Ct. R.</u> 37(9)(a), (b).  Rule 37(9)(i) authorizes the court to impose discipline, including suspension, upon an attorney's <u>indictment</u> for a felony.

Although Rule 37(9)(i) "does not provide a procedural framework for a post-suspension hearing," we have interpreted it "to require a post-suspension hearing to occur promptly so as to comply with due process."  <u>Reiner's Case I</u>, 152 N.H. at 167.  Such a hearing must take place within 30 days of its request and be held before the court or before a referee, at the court's discretion.  <u>Id</u>.  At the hearing, the ADO bears the burden of proving that an interim suspension is necessary by a preponderance of the evidence.  <u>Id</u>.

Similarly, although Rule 37(9)(i) "does not set forth a standard by which the court may exercise its discretion in suspending an attorney," we have read the rule in the context of related rules and have concluded that Rule 37(16)(f) provides the requisite standard.  <u>Id</u>. at 168.  Thus, we have held that "the court may impose an interim suspension pending the resolution of [felony] criminal charges pursuant to Rule 37(9)(i) when it is deemed necessary for the protection of the public and the preservation of the integrity of the legal profession."  <u>Id</u>.; <u>see</u> <u>Sup. Ct. R.</u> 37(16)(f).

Accordingly, we have explained that the ADO's burden at the hearing "is not to prove that the respondent committed the crimes alleged," but rather to "show that the respondent's alleged conduct in the alleged crimes makes suspension necessary for the protection of the public and the integrity of the legal profession."  <u>Reiner's Case I</u>, 152 N.H. at 170.

In his hearing memorandum, the respondent acknowledged that the ADO had to establish "that, considering the allegations in the indictment, the suspension is necessary for the protection of the public and the preservation of the integrity of the legal profession."  <u>Id</u>. at 169.  He also stated that the ADO's burden was to prove both prongs of the <u>Reiner's Case I</u> test by a preponderance of the evidence.  Moreover, in that memorandum, the respondent argued only that an interim suspension was not necessary; he never contended that the referee was required to consider whether a lesser sanction would suffice.  Given his arguments before the referee, we deem the respondent's arguments that this case is governed by Rule 37(9-A) to be waived.

C

The respondent next asserts that the referee erred because he "refused to apply the standards used in [issuing] preliminary injunctive relief."  <u>See</u> <u>N.H. Dep't of Envtl. Servs. v. Mottolo</u>, 155 N.H. 57, 63 (2007) (explaining that the party seeking a preliminary injunction must show that the party is in "immediate danger of irreparable harm," has "no adequate remedy at law," and

7

is "likely [to] succeed on the merits"). The respondent argues that, because "[i]nterim suspensions function similarly to civil temporary restraining orders," Am. Bar Ass'n, Annotated Standards for Imposing Lawyer Sanctions 66 (2015), they should be issued based upon the same standards that apply to such restraining orders. See In re Discipline of Trujillo, 24 P.3d 972, 979 (Utah 2001).

In making this argument, the respondent relies upon Trujillo, 24 P.3d at 979, and People v. Varallo, 913 P.2d 1, 6 (Colo. 1996). However, neither Trujillo nor Varallo involved rules similar to Rule 37(9)(i), which requires the court to "take such actions as it deems necessary, including but not limited to the suspension" of an attorney who is "indicted or bound over for any felony." Sup. Ct. R. 37(9)(i); see Arthur F. Greenbaum, Administrative and Interim Suspensions in the Lawyer Regulatory Process — A Preliminary Inquiry, 47 Akron L. Rev. 65, 98 & n.146, 112 & n.232 (2014) (identifying New Hampshire as one of the jurisdictions with a specific rule regarding imposing an interim suspension upon an attorney based upon the filing of an indictment). Although the standards for issuing preliminary injunctions may include considerations relevant to a determination as to whether an interim suspension based upon a felony indictment is proper, we hold that their application is not mandated by the plain language of Rule 37(9)(i).

D

The respondent's remaining arguments challenge the referee's factual findings and recommendation that we not lift the respondent's interim suspension. We do not specifically address those challenges because, even if we give no deference to the referee's findings, our independent review of the same paper record and offers of proof as were before the referee lead us to make the same factual determinations that he made, and we retain the ultimate authority to determine whether suspension is necessary under Rule 37(16)(f). Reiner's Case II, 152 N.H. at 597.

To retain in effect the respondent's interim suspension, we must conclude that the ADO has proved by a preponderance of the evidence that the suspension is necessary for: (1) "the protection of the public"; and (2) "the preservation of the integrity of the legal profession." Sup. Ct. R. 37(16)(f); see Reiner's Case I, 152 N.H. at 168; Reiner's Case II, 152 N.H. at 597. We are mindful that the ADO's burden is not to prove that the indictment allegations are true, but rather to show that, considering the allegations and any additional evidence submitted, the respondent's suspension is necessary to protect the public and the integrity of the legal profession. Reiner's Case I, 152 N.H. at 168-69.

8

The indictment alleges that the respondent sought to induce E.F., the self-represented victim in a domestic violence matter, to withhold testimony or information from the court by telling her that he had spoken with Judge Moore, who said that he did not want to hear the domestic violence matter. The statement, "I spoke to the judge yesterday," suggests that the respondent was not relying upon what Judge Moore said in the courtroom, but instead that he had met privately with the judge. This statement implies that the respondent and the judge had an ex parte communication and that the two shared a special relationship that the respondent could exploit.

We also consider the additional evidence presented by the ADO. See id. at 168 (in meeting its burden of proof, the ADO need not rely solely upon the allegations in the indictment); Reiner's Case II, 152 N.H. at 598 (deciding that, where the ADO did not offer "any additional evidence . . . to corroborate or supplement the allegations or to show that the respondent pose[d] a threat to the public," the allegations alone were insufficient to "meet both prongs of Rule 37(16)(f)"). The ADO presented evidence that corroborates E.F.'s account of the respondent's statement alleged in the indictment. According to the victim/witness advocate, E.F. was told by the respondent, "I've spoken to the Judge and he wants this to go away." This is substantially similar to the statement E.F. attributes to the respondent, "I spoke to the judge yesterday; he doesn't want to hear this." It is also substantially similar to the statements that Topham attributes to the respondent in the criminal case. According to Topham, the respondent said that Judge Moore and the victim wanted the criminal case to "go away."

The ADO also supplemented the indictment's allegations. For instance, the ADO presented evidence that the respondent's alleged statements to E.F. constituted misrepresentations. Although the respondent told E.F. that Judge Moore had indicated that he did not want to hear the domestic violence case, the ADO presented evidence that, in fact, there had been no such communication. At most, Judge Moore suggested on the record that the respondent "sit down with" Barry, E.F.'s attorney, to "work . . . out" the domestic violence case. There was no evidence that Judge Moore indicated that he did not want to hear the domestic violence case or that he wanted it to "go away."

Additionally, the ADO presented evidence of other misrepresentations by the respondent. The ADO presented evidence that the respondent told E.F. that he had spoken to Barry, when, in fact, he had not done so. E.F. reported that the respondent made this statement, and Barry confirmed that E.F. told him the same thing. Additionally, the ADO presented evidence that the respondent told Topham that the victim did not want the criminal case to go forward, when, in fact, she wanted the criminal case to be pursued. Moreover, it is undisputed that the respondent was previously disciplined for dishonesty.

The evidence in this case demonstrates that the respondent's alleged statements to E.F. about Judge Moore are not isolated, but instead, if proved, are part of a pattern of dishonesty. The injury to the public and to the profession is substantial whenever an attorney is dishonest. See Bosse's Case, 155 N.H. 128, 132 (2007). "No single transgression reflects more negatively on the legal profession" and erodes public confidence in the bar more completely "than a lie." Id. (quotations and brackets omitted); see Am. Bar Ass'n, supra at 209 (stating that, because "[t]he public expects lawyers to be honest," when lawyers engage in dishonest conduct, "public confidence in the integrity of officers of the court is undermined"). This is because the privilege of practicing law includes "the concomitant responsibilities of truth, candor and honesty." Bosse's Case, 155 N.H. at 131 (quotation omitted). "Lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity." Id. (quotation omitted). "Accordingly, it is the responsibility of every attorney at all times to be truthful." Id. (quotation omitted).

Considering the allegations in the indictment as well as the additional evidence presented by the ADO, we hold that the evidence in this case is sufficient to establish, by a preponderance of the evidence, that the respondent's interim suspension is necessary to protect the public and preserve the integrity of the legal profession. See Reiner's Case II, 152 N.H. at 598 (holding that interim suspension was not required to protect the public because there was no allegation that the attorney had "misused client[ ] funds, made false statements or engaged in other conduct which poses an immediate threat to clients or to the public"). Accordingly, because both prongs of the Reiner's Case I test are met, we decline to lift the respondent's interim suspension.

So ordered.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

10